THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HARRY SCOTT, Defendant-Appellant.

(No. 55782;

First District (3rd Division)—July 19, 1973.

*Rehearing denied August 15, 1973.*

622

Gerald W. Getty, Public Defender, of Chicago, (Robert M. Gray and James N. Gramenos, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Robert C. Samko, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

Shortly after midnight on February 7, 1970, a robbery took place in an office building located at 130 North Wells Street, Chicago. As John Tatum, a janitor, was vacuuming the carpet of the lobby, Leon Walker, another janitor, left the building by walking through a revolving door near where Tatum was working. After Walker's departure the door continued to turn and Tatum looked up into a gun barrel. The gun was held by a man whom Tatum later identified as the defendant, Harry Scott. The intruder had a handkerchief over his mouth and was wearing a leather jacket and yellow slacks. An accomplice followed him into the lobby. A "holdup" was announced and Tatum was pushed into an elevator. Tape was placed over his mouth and eyes and his hands were secured behind his back. His money, watch and keys were taken.

At the same time Fred Yates, another janitor, was working in the basement of the building. Someone called for the elevator which was located there and Yates brought it up to the first floor. When he opened the door he saw a gun an inch from his face. He was shoved to the back of the elevator and turned around. His hands were tied and he was blindfolded and robbed. He was then transferred to the elevator in which Tatum had been placed and they were taken to the top floor of the building.

William Murray, a computer operator who was working in the building, was also robbed by two armed men. He and Roger Hoffman, also a computer operator, were led to the top floor and placed with Tatum and Yates. Later, the four freed themselves from their bonds and summoned the police.

Police officers responded to the call, spoke with Tatum, Yates, Murray and Hoffman and received a description of at least one of the robbers from Tatum. The investigation of the robbery was assigned to Detective Bernard Stahl. He discovered that Leon Walker had previously been arrested with Harry Scott (See *People v. Scott & Walker* (1968), 100 Ill.App.2d 473, 241 N.E.2d 579), and when he showed Tatum some photographs including one of Scott, Tatum identified Scott as one of the robbers.

Early on the morning of February 10th Stahl arrested Walker. He told Walker that Scott had been identified and that the police believed Walker was his confederate. Walker then stated that two or three days before the robbery he had discussed with Scott how simple it would be to "pull a stickup" at the building where he worked, and that on his way out of the building on February 7th he noticed Scott and another man near the door. He gave the police Scott's address.

Immediately several detectives, including Stahl, went to that location, obtained a key from the desk clerk and entered Scott's apartment unannounced. The officers awakened Scott, arrested him for the robbery and seized a quantity of checks from the top of the dresser opposite his bed. Several police officers were present when he was questioned at the police station. According to Stahl he made an oral statement confessing his participation in the crime.

Scott was indicted in separate counts for the armed robbery of Tatum and Yates. Prior to his trial, he moved to suppress the evidence taken from his apartment and the statement made after his arrest. The court denied both motions. The case was tried without a jury. At the conclusion of the trial the court acquitted Scott of the robbery of Yates but found him guilty of robbing Tatum. He was sentenced to serve from five to ten years in the penitentiary.

■■ Scott advances many contentions in this appeal but we need not consider all of them as his conviction must be reversed because of trial errors. The principal error was the State's failure to comply with the repeated mandate of Illinois reviewing courts that all material witnesses must be called to testify if a defendant claims his confession was coerced. At the hearing on the motion to suppress the statement he made after his arrest, Scott testified that when he was questioned at the police station Detective Stahl and three other officers were in the

room with him. These officers were identified in subsequent testimony as Sergeant Kelly and Detectives Olsen and Utter. Scott asserted that when Stahl went out of the room a plastic bag was placed over his head to induce his confession; he was beaten in the stomach and lost consciousness. When he revived he was asked to sign a confession but he refused and was beaten again and again with fists and a stick and was knocked unconscious two more times.

The only prosecution witness to rebut this testimony was Stahl who denied Scott's charges. Kelly, Olsen and Utter, the officers accused of the brutality (and who were named in the State's list of witnesses as witnesses to the oral statement), were not called to testify and their absence was not explained. In *People v. Armstrong* (1972), 51 Ill.2d 471, 282 N.E.2d 712, the defendant's conviction was reversed because the prosecution failed to produce or explain the absence of all the material witnesses to the making of his alleged involuntary statements. The court, in holding that the statements were improperly admitted into evidence, cited an unbroken line of cases enforcing the rule that:

> "* * * when the voluntary nature of a confession is brought into question by a motion to suppress, the State must produce all material witnesses connected with the taking of the statements or explain their absence. As was stated in *People v. Wright* (1962), 24 Ill.2d 88, 92, 'The burden of proving a confession is voluntary is one which the State must assume when the admissibility of a confession is questioned on the grounds that it was coerced. Only by producing all material witnesses connected with the controverted confession can the State discharge this burden.'"

■■■ A second error of reversible magnitude pertains to the checks taken from Scott's room. The checks were received in evidence over his objections that they were seized in violation of his constitutional rights and that no proper foundation had been laid for their admission into evidence. Scott's arrest was based on probable cause and was valid. (*Ker v. State of California*, 374 U.S. 23, 10 L.Ed. 726. *People v. Johnson* (1970), 45 Ill.2d 283, 259 N.E.2d 57.) The checks were in plain view close to his bed, their seizure was reasonable and the motion to suppress, and the objection on this ground renewed at the trial, were correctly denied. (*Abel v. United States*, 362 U.S. 217, 4 L.Ed.2d 668; *People v. Barbee* (1966), 35 Ill.2d 407, 220 N.E.2d 401.) Whether it was proper to admit the checks into evidence is another matter. The checks were imprinted with the names of the Amalgamated Meat Cutters' Credit Union and Stanford D. Scott. There was testimony that some offices in the building at 130 N. Wells Street had been forcibly

entered the night of the robbery but there was no testimony that checks were either stolen or missing from these offices. If the checks were stolen from the Wells Street building at the time the robbery was committed, their possession by Scott would have been evidence of his presence in that building. Evidence of a defendant's commission of other crimes is admissible to estabish a material fact such as his intent, motive or identity. (*People v. Dewey* (1969), 42 Ill.2d 148; 246 N.E.2d 232; *People v. Scott* (1968), 100 Ill.App.2d 473, 241 N.E.2d 579.) However, before such evidence can be received it must first be shown that a crime actually took place and that the defendant committed it or participated in its commission. The checks tended to establish Scott's commission of a separate crime, and the trial court, in its summation of the evidence at the conclusion of the trial, stressed Scott's possession of the checks as proof of his guilt. In view of the lack of testimony that the checks were the property of the credit union and Stanford Scott or that they were stolen the night of the robbery from offices occupied by them, an inadequate foundation was laid for their admission and their reception into evidence and consideration by the court was prejudicial to the defendant.

■■■ There is no merit to Scott's contentions that his conviction for robbing Tatum was inconsistent with his acquittal of the charge of robbing Yates, or that his in-court identification was induced by impermissibly suggestive pretrial identification procedures. As this case will be remanded for a new trial, other alleged errors need not be considered since the subsequent proceedings are not likely to unfold in a manner identical with the first trial.

Scott argues, however, that his conviction should be reversed without remandment because the trial court erred in not discharging him under the "four term act" (Ill. Rev. Stat 1969, ch. 38, par. 103—5(a)) which provides that every person in custody shall be brought to trial within 120 days unless the delay is occasioned by the defendant himself. Scott was arrested on February 10, 1970. On March 16th the case was continued on his motion to April 2nd, which tolled the running of the statute and began a new period of 120 days. (*People v. Stuckey* (1967), 83 Ill.App.2d 137, 227 N.E.2d 135.) On August 26, 1970, he filed a petition for discharge which alleged that he was not responsible for any of the continuances granted after April 2nd. The case had been continued for six times between April 2nd and August 26th; three of these continuances were charged to Scott and three to the State. The three charged to Scott were those of June 8th, 16th and 17th; the three charged to the State were in July and August. Scott represented that he should have been tried on or before July 31, 1970, because the con-

tinuances in June were improperly charged to him. We will examine the proceedings on the three June dates to determine if the postponements were correctly attributed to Scott.

■■■ On June 8th Scott was indicted and was brought to court for arraignment. The judge informed him that his lawyer had not been heard from (the lawyer represented him at the preliminary hearing but had not been retained for the trial) and Scott remarked that he had not heard from him either. The judge inquired when he would have his lawyer in court and Scott responded: "I'll try to have him in here next week." The arraignment judge then continued the case until June 15th, "motion defendant." It is impermissible to ascribe to a defendant, when he appears for arraignment without counsel, a motion for a continuance he did not make. (*People v. House* (1957), 10 Ill.2d 556, 141 N.E.2d 12; *People v. Wyatt* (1962), 24 Ill.2d 151, 180 N.E.2d 478.) In both *House* and *Wyatt* the continuances were suggested by the court so that the defendants' lawyers could be present. The continuances were attributed to the defendants and this was held to be error. Scott did not request the continuance. He was not asked whether he wished to waive his right to counsel at arraignment or wished the services of the public defender so that he could be arraigned. In accordance with the decisions in *People v. House* and *People v. Wyatt*, the continuance of June 8th should not have been charged to Scott.

■■■ On June 15th Scott was arraigned, the public defender was appointed to defend him and the case was held on call by order of court until the following day. When the case was called on June 16th the trial judge to whom it had been assigned announced that it would be held until the next morning. There was a bit of confusion as to the attorney who represented Scott. When this was cleared up the assistant public defender, who was in the courtroom, asked that the case be held on call until the following morning so that "proper motions" could be filed. The assistant State's attorney said "Fine," and the court held the case until the 17th but, over the strenuous objection of his counsel, ascribed the postponement to Scott. In determining whether the postponement was properly ascribed to Scott, the criterion we must use is whether his request caused or contributed to a delay in the trial of the case. The facts in each case must be carefully examined to prevent a mockery of justice by either the technical evasion of a defendant's right to a speedy trial or by his discharge when in fact a delay was caused by him. (*People v. Fosdick* (1967), 36 Ill.2d 524, 224 N.E.2d 242.) The public defender's suggestion that the case be held on call for a few more hours to enable him to file motions for discovery was a moderate request. To find that this request impeded

the progress of the case would defeat the purpose of the statute by technical evasion. The court itself had held the case on call from June 15th to 16th and was going to hold it to the 17th. When the defense attorney made the same suggestion the prosecutor readily agreed. Holding the case to the 17th instead of continuing it to a later date expedited rather than retarded the trial. The discovery motion was filed and some objections to it were disposed of on the 17th—just two days after arraignment. Under these circumstances keeping the case on call overnight was not the type of delay for which the defendant should forfeit his right to be tried within the original 120-day period.

On June 17th, as we indicated above, the assistant State's attorney objected to several of the items of information demanded in the discovery motion. The court sustained objections to 7 items, gave the State until July 1st to answer 14 others and charged the continuance to Scott. The following colloquy then took place:

The Court: "How much time do you need to answer?

Defense Counsel: I'll be ready to file further motions when I hear the answer.

Prosecutor: Whatever the usual time to answer.

The Court: Two weeks. July 1st, without subpoenas. Motion State?

Prosecutor: Motion defendant.

The Court: Motion defendant, without subpoenas.

Defense Counsel: Mr. Scott, you understand your right to a speedy trial. Do you understand that each time you delay the proceeding the prosecutor has another four months to try you in? Do you understand?

Defendant: I understand the Fourth Term.

Defense Counsel: Do you wish to delay the proceedings today?

The Defendant: No, I do not wish to delay.

Defense Counsel: He does not wish to delay the date.

The Court: You're the one that's asking for certain items to be answered.

Defense Counsel: What constitutes a delay is up to you, Judge.

The Court: You're asking that the State give you certain answers so you can prepare.

Defense Counsel: That's right, Judge.

The Court: Therefore, it's motion defendant. Without subpoenas, motion defendant, July 1st."

Scott protests that he should not have been charged with a delay occasioned by the assertion of his right to discovery; that to so charge

him would create an unjust conflict between his right to discovery and his right to be tried within 120 days.

The right to the information sought by the defendant and the right to a speedy trial were created for his own protection. In *People v. Hairston* (1970), 46 Ill.2d 348, 263 N.E.2d 840, the court dealt with the contention that the defendant was put in the dilemma of having to choose between his right to a speedy trial and his right to be represented by counsel of his own choice. It concluded that one right could not be balanced against the other in order to provide an avenue for the defendant to escape prosecution; a delay because his counsel was unable to appear at the time appointed for trial was properly charged to the defendant. This rationale is controlling in the present case, and we do not interpret the decision in *People v. Nunnery* (1973), 54 Ill.2d 372, 297 N.E.2d —, as dictating a different result.

In *Nunnery*, the defendant was arraigned on June 4, 1969, the 115th day of the 120-day statutory period. The public defender who was appointed to represent him filed a written motion for discovery. The State answered some of the matters in the motion and, after the assistant State's attorney mistakenly informed the court that the statutory period would not expire for six more weeks, was given 15 days to answer others. The case itself was continued to June 12th. On June 12th the defendant moved for discharge for want of prosecution. He alleged that he had been in custody without a trial for more than 120 days and that he had not caused or contributed to the delay. His motion was granted.

The State appealed to the Appellate Court. It contended that the defendant's motion for discovery necessitated the continuance allowed on June 4th and that it was properly charged to him. The defendant argued that he was not responsible for the delay, that the information he sought could have been supplied quickly and that the State itself was at fault because it incorrectly informed the court the end of the 120-day period was six weeks away. He further contended that if the delay were charged to him it would create an improper conflict between his statutory right to discovery and his constitutional right to a speedy trial. This court rejected the defendant's arguments and held that the trial court erred in discharging him. *People v. Nunnery* (1972), 4 Ill.App.3d 217, 280 N.E.2d 537.

The Supreme Court allowed a petition for leave to appeal and concluded that the delay was not occasioned by the defendant. The court pointed out that he was not arraigned until 115 days after he had been taken into custody; that if the State had been ready for trial within the 120-day period as it asserted it was the information requested by the

defendant could have been given him promptly; that it was the State's attorney who erroneously advised the court as to the remaining time in which the defendant could be tried, and that there was nothing in the record to indicate that the defendant's counsel (who had been appointed the day of the continuance) knew when the defendant was arrested or how long he had been in custody. Beyond stating that the defendant was clearly entitled to discovery, the court did not answer his contention that charging the delay to him would have improperly forced him to elect between his right to pretrial discovery and his right to a speedy trial. The court decided the case on the precise facts before it, but implicit in its decision is the holding that not every motion for discovery causes a delay which can be attributed to the defendant.

■■■ Discovery in criminal cases is a recent development of the laws and accommodation must be made for the problems which accompany it. All discovery motions are not intrinsically dilatory, therefore not every such motion automatically extends the period in which the defendant must be tried. Thus, in *Nunnery*, although the defendant filed a discovery motion the court held that he was not responsible for the continuance which followed. Motions for discovery may or may not require time to comply with them. A motion may be simple and easily answered or it may be detailed and difficult to answer. The information requested may be presently known or it may only be obtained after search and inquiry. The requested information may be reasonable and supplied without objection or it may call forth objections which must be heard and resolved. A discovery motion which the State can answer quickly would cause little or no delay; the State should not be permitted to use such a motion as an excuse to toll the statute implementing the constitutional right to a speedy trial. On the other hand, a discovery motion that calls for answers which are not quickly available or requests answers replete in detail would cause a legitimate delay; such a motion is properly attributable to a defendant and tolls the running of the statutory period. Whether a motion falls into the former or the latter category would depend on the facts of each case. This calls for the trial court's appraisal of the motion, its need, timeliness and complexity; it calls for the court's appraisal of the State's ability to answer the motion immediately or the merit of the State's reasons for not doing so. The interpretation of the motion and of the availability of the required information, the reasonable time needed to answer and whether proposed objections are genuine or dilatory, should rest in the judgment of the trial court and its decision as to the accountability for the ensuing delay, if there is one, should be sustained unless it is clearly shown that the court's discretion was abused.

■■■ Although Scott did not want the proceedings delayed, neither

he nor his attorney withdrew the motion for discovery. The attorney had filed the motion and he wanted it answered. Scott, apparently, wanted the information but no delay. He did not object to the appointment of the attorney and had accepted and used his services. His attorney did not object to either the two-week continuance or to its being charged to Scott. A delay occasioned by a defendant's attorney is attributable to him. (*People v. Rankins* (1960), 18 Ill.2d 260, 163 N.E.2d 814, *cert. denied*, 363 U.S. 822.) If a defendant agrees to a continuance during the 120-day statutory period, the period is suspended. (*People v. Williams* (1963), 27 Ill.2d 327, 189 N.E.2d 314.) The State acted diligently; it objected to some of the discovery demands as soon as they were presented and there is nothing in the record to suggest that the remaining demands could have been answered immediately. The court determined that the State needed time to comply and did not abuse its discretion in ascribing the necessary delay to the defendant for whose benefit it was ordered. The court correctly denied the defendant's petition for discharge presented first on August 26th, and a second time, just prior to the start of his trial, on October 15, 1970.

The judgment is reversed and the cause is remanded for a new trial.

Reversed and remanded.

McNAMARA and McGLOON, JJ., concur.