**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180248-U

Order filed August 25, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0248 Circuit No. 17-CF-30 |
| | ) | |
| KENNETH W. OHLER, | ) ) | Honorable Thomas A. Keith, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice McDade and Justice Lytton concurred in the judgment.

**ORDER**

¶ 1   *Held*:   (1) The circuit court properly admitted evidence of the defendant's other crimes to demonstrate consciousness of guilt. (2) The State's improper remarks during rebuttal argument are not reversible plain error.

¶ 2   The defendant, Kenneth W. Ohler, appeals his convictions for first degree murder and home invasion. The defendant argues the Tazewell County circuit court erred by permitting the State to (1) introduce evidence of the defendant's other crimes and (2) misstate facts and raise new arguments during rebuttal argument.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged the defendant with two counts of first degree murder (720 ILCS 5/9-1(a) (West 2016)) and home invasion (*id.* § 19-6(a)(5)), alleging he shot and killed Michael Dixon after unlawfully entering Michael's residence. The matter proceeded to a jury trial.

¶ 5        In June 2016, the defendant became the sales manager of a car dealership, and hired Demetrio Alejandro Preciado, Michael's stepson, as a salesperson. The defendant and Demetrio became close friends, and Demetrio saw the defendant as a father figure. However, their relationship soured. On one occasion, after Demetrio borrowed a company vehicle, the defendant sent him text messages threatening to tell their general manager that Demetrio stole the vehicle. Demetrio returned the vehicle and showed the text messages to the general manager, who subsequently fired the defendant.

¶ 6        In December 2016, the defendant texted Jeanette Dixon, Michael's wife and Demetrio's mother, that he was going to kill himself. The defendant got a ride to the home of Michael, Jeanette, and Demetrio and entered through the unlocked front door. When Jeanette saw the defendant, she told him to leave. The defendant ignored her and sat on a couch in the living room. Michael exited a bedroom and confronted the defendant, and Jeanette went into the kitchen. Jeanette heard Michael say, "Seriously, you're going to shoot me?" Jeanette then heard a gunshot. Jeanette ran outside to flag down an officer, who was working at a nearby festival, and told him that Michael had been shot. Officers found Michael in the living room, face down in a pool of blood and the defendant lying on a nearby couch with a gunshot wound to his chest and a firearm in his hand. The defendant was taken to a hospital for treatment.

¶ 7    During his hospitalization, a nurse asked the defendant what happened to his chest. The defendant replied that he had shot himself because he was going to be arrested and that he "had done something terrible."

¶ 8    The State called a jailhouse informant to testify, who the defendant had previously sought to bar via a motion *in limine*. The informant testified that the defendant solicited his assistance to blow up Demetrio and Jeanette's house while they were home, to prevent Demetrio and Jeanette from testifying. According to the informant, the defendant said he wanted the house to be destroyed because "no face, no case," which he understood to mean there would be no case against the defendant without witnesses. The court admitted the testimony, over the defendant's objection, to show motive, intent, and consciousness of guilt.

¶ 9    At trial, the State's forensic pathologist testified that the location and direction of Michael's gunshot wound were consistent with the shooter having been in a seated position when the gun was fired. No fingerprints were found on the gun.

¶ 10    The State's forensic scientist found DNA on the gun from swabs of its barrel and the textured left and right sides of its grip. All three locations contained a DNA profile that matched the defendant and did not match Michael. This profile was "no more common than approximately 1 in 19 octillion unrelated individuals." A second DNA profile was found in the textured right side of the gun grip. This was a partial profile, as it contained only 3 out of the 24 markers tested, and it was "no more common than approximately 1 in 13 unrelated individuals." Michael could not be excluded from this second profile.

¶ 11    The defendant testified that, before he entered the house, he knocked on the door and someone inside told him to come in. According to the defendant, when Michael confronted him, he did not want to deal with Michael and decided to shoot himself right then. However, when the

3

defendant pulled the gun out of his jacket pocket, Michael grabbed it, causing it to fire, and the bullet struck and killed Michael. The defendant testified that he shot himself when he saw a patrol vehicle approach the house.

¶ 12    During its closing argument, the State contended that the defendant entered Michael's house without permission and intentionally shot Michael, relying on Jeanette's testimony that the defendant was sitting on the living room couch, which was consistent with the forensic pathologist's testimony regarding Michael's gunshot wound, and the soured relationship between the defendant and Demetrio.

¶ 13    During the defendant's closing argument, defense counsel insisted that the DNA evidence supported the conclusion that Michael's death was an accident, saying, "That makes sense if [the defendant] was holding the gun, and then they had a partial [DNA] deposit from someone other than [the defendant], and 3 of the 14 DNA markers came [back] positive for [Michael] ***." Defense counsel argued that Michael's DNA was found on the gun, and that the presence of Michael's DNA on the gun supported the conclusion that Michael died from an accidentally inflicted gunshot wound resulting from a physical struggle between the defendant and Michael. Based on this reasoning, defense counsel argued that the defendant lacked the intent necessary to support the charged offense.

¶ 14    On rebuttal, the State said, "[W]e're going to go ahead and talk about some things that haven't been touched on yet." The court overruled defense counsel's objection to this statement. The State argued that the forensic scientist did not state that Michael's DNA was on the gun, but that Michael's DNA profile "could not be excluded." The State asserted, "[The forensic scientist] said that there were only three DNA markers that showed up that were possibly [Michael's]. *** I think *** the statistic was 1 in 13 people. That means ***, since there are 14 of you, at least one

4

of you would have those same DNA markers." The State also discussed the defendant's alleged solicitation of the murder of Demetrio and Jeanette. At the trial's conclusion, the court provided a verbal limiting instruction to the jury, permitting them to consider the other-crimes evidence only for intent, motive, and consciousness of guilt purposes. This limiting instruction was also included in the packet of jury instructions provided to the jury.

¶ 15    The jury found the defendant guilty of two counts of first degree murder with a firearm enhancement, which merged together, and home invasion with a firearm enhancement. The court sentenced the defendant to two consecutive terms of natural life imprisonment followed by three years' mandatory supervised release. The defendant filed a motion for judgment of acquittal notwithstanding the verdict or for new trial, arguing, *inter alia*, that the court erred by admitting evidence of his solicitation of arson and murder, as well as a motion to reconsider sentence. The court denied both motions. The defendant appeals.

¶ 16                                    II. ANALYSIS

¶ 17    The defendant argues the circuit court erred by permitting the State to (1) introduce other-crimes evidence and (2) misstate facts and raise new arguments during its rebuttal argument.

¶ 18                            A. Other-Crimes Evidence

¶ 19    First, the defendant argues the court erred by permitting the State to present testimony concerning his solicitation of the destruction of the house, with Demetrio and Jeanette inside, because the evidence's only possible purpose was to prove the defendant's propensity to commit criminal acts and its probative value was substantially outweighed by its prejudicial impact.

¶ 20    Evidence of crimes for which a defendant is not on trial is inadmissible if it is only relevant to establish his propensity to commit crime. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, such evidence is admissible to establish any material

question other than propensity, including "*modus operandi*, intent, identity, motive, or absence of mistake." *Thingvold*, 145 Ill. 2d at 452; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). "When evidence of other crimes is offered, the trial judge must weigh its probative value against its prejudicial effect, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value." *People v. Manning*, 182 Ill. 2d 193, 214 (1998); see also Ill. R. Evid. 403 (eff. Jan. 1, 2011). We review a circuit court's ruling on the admissibility of other-crimes evidence for an abuse of discretion. *Thingvold*, 145 Ill. 2d at 452-53. We will only find an abuse of discretion where the circuit court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take its view. *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 21    The defendant argues that the evidence regarding his alleged solicitation of the murder of Demetrio and Jeanette was not relevant to show motive, intent, or consciousness of guilt relating to his alleged shooting of Michael, and, therefore, the evidence should not have been admitted because its prejudicial impact outweighed its probative value. However, evidence of a defendant's efforts to prevent witnesses from testifying against him is admissible to show consciousness of guilt. *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 21; *People v. Evans*, 209 Ill. 2d 194, 222 (2004); *People v. Jones*, 82 Ill. App. 3d 386, 393-94 (1980); *People v. Baptist*, 76 Ill. 2d 19, 27 (1979). According to the testimony in question, the defendant endeavored to hire two individuals to, in effect, murder Demetrio and Jeanette to keep them from testifying at trial, because "no face, no case." Thus, this testimony was relevant to demonstrate consciousness of guilt, as it is evidence of the defendant's efforts to prevent witnesses from testifying against him.

¶ 22    While evidence of the defendant's alleged solicitation of the murder of Demetrio and Jeanette was highly prejudicial to the defendant, it had immense probative value concerning the defendant's consciousness of guilt, as it indicated that the defendant believed it was necessary to

6

have witnesses killed to prevail at trial. Additionally, the prejudicial effect was mitigated by the court's limiting instruction, which permitted the jury to consider the evidence only for intent, motive, and consciousness of guilt purposes. See *People v. Young*, 381 Ill. App. 3d 595, 601 (2008) ("A limiting instruction reduces any prejudice created by admitting other-crimes evidence."). The circuit court found that the probative value of the testimony regarding the defendant's alleged solicitation was not substantially outweighed by its prejudicial impact. This finding was not arbitrary, fanciful, or unreasonable, and a reasonable person could adopt that view. See *Hall*, 195 Ill. 2d at 20. The court did not abuse its discretion by admitting the other-crimes evidence in question. See *Thingvold*, 145 Ill. 2d at 452-53.

¶ 23                         B. The State's Rebuttal Argument

¶ 24        Next, the defendant argues that the court erred by permitting the State to misstate facts and raise new arguments during rebuttal. Specifically, the defendant argues that it was error for the State to (1) say, that, since there were 14 jurors, at least of one them would have the same DNA markers as the partial DNA sample, and (2) raise the alleged solicitation of the murders of Demetrio and Jeanette that had not previously been discussed in closing arguments. The defendant failed to preserve these issues by including them in a posttrial motion. See *People v. Denson*, 2014 IL 116231, ¶ 11 (2010) ("In criminal cases, [the Illinois Supreme Court] has held consistently that a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion."). However, the defendant urges us to consider this issue under the plain error doctrine. The first step in plain error analysis is to determine whether a "plain error" occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). "The word 'plain' here is synonymous with 'clear' and is the equivalent of 'obvious.' " *Id.* at 565 n.2. If the reviewing court determines that the circuit court committed a

7

clear or obvious (or "plain") error, it proceeds to the second step in the analysis: determining whether the error is reversible. *Id.* at 566. A plain error is reversible where (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id.* at 565. On appeal, the defendant bears the burden of establishing that the plain error test has been satisfied. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Here, the defendant solely argues that the evidence was closely balanced.

¶ 25        Assuming, *arguendo*, that the State misstated facts in its closing argument and its rebuttal remarks were improper, any potential error does not amount to reversible plain error because the evidence is not closely balanced.

¶ 26        The defendant contends that the evidence was closely balanced because the trial's outcome turned on a credibility contest between Jeanette and the defendant. We disagree. The forensic pathologist testified that Michael's wound was consistent with his shooter firing from a seated position, which aligns with Jeanette's testimony that the defendant sat on the living room couch prior to his confrontation with Michael. The forensic scientist obtained DNA from the gun's barrel and grip, which showed a DNA profile that matched the defendant that was "no more common than approximately 1 in 19 octillion unrelated individuals." During his hospitalization, the defendant admitted to a nurse that he had shot himself because he did "something terrible" and was going to be arrested. Finally, the evidence showed that the defendant solicited the murder of Demetrio and Jeanette to prevent them from testifying against him at trial. The weight of the evidence of the defendant's guilt far outweighed the evidence suggesting the defendant's innocence, which included the defendant's own testimony that Michael was shot after the gun

8

accidentally discharged when he tried to grab it from the defendant's grasp, and the fact that Michael's DNA could not be excluded from a second, partial profile that was found on the gun. Contrary to the defendant's assertion that the evidence came down to a credibility contest, the evidence strongly indicated the defendant's guilt, such that the evidence was not closely balanced.

¶ 27                                    III. CONCLUSION

¶ 28        The judgment of the circuit court of Tazewell County is affirmed.

¶ 29        Affirmed.